HOME INSURANCE CO. *v.* ERNEST D. MOYERS

5-5735                                            477 S.W. 2d 193

Opinion delivered March 6, 1972

52

*Griffin Smith,* for appellant.

No brief for appellee.

FRANK HOLT, Justice. Appellant brought this action to cancel its automobile liability policy issued to appellee, alleging that the coverage was fraudulently secured by appellee after the occurrence of an accident. Appellee answered and asserted that a valid binder on the policy was agreed upon in a telephone conversation with appellant's agent approximately forty-five minutes preceding appellee's involvement in an automobile accident. The chancellor found that coverage existed and for reversal of that decree the appellant contends that such finding is against the preponderance of the evidence.

Appellant's agent, Mr. S. W. Bowker, testified that on Friday night November 20, 1970, the appellee telephoned him at his home stating that his car insurance was up for renewal and he wished to purchase liability insurance on two cars and a truck. The agent was unable to recall any previous conversation about insurance with the appellee. Nevertheless, coverage on the vehicles was discussed and a binder effected. The agent further testified that the appellee "offered to come over that night, but I told him I didn't have books at home to take care of it." When the appellee asked, "can you bind me" the agent advised him, "I will bind you in Home Insurance [appellant] and we arranged for me to see him Mon-

day" to complete the application since he (the agent) was attending a football game in Texas the next day. The agent testified that to the best of his recollection the appellee's telephone call to him was made between 8:15 and 8:30 p.m. and that the call "came after 8:15 to the best of my knowledge." He and his wife were watching a TV movie from 7 to 9 p.m. The agent testified that he and his wife had been watching the movie for an hour to an hour and a half when the telephone call came from the appellee: "I know it was in the latter stages of the movie. * * * in the last half [of the movie] to the best of my knowledge." During the telephone conversation appellant's agent heard some noise in the background which he could not describe, but stated that appellee's conversation appeared normal and he did not detect any excitement in appellee's voice.

The agent received a call from the appellee on the following Sunday afternoon and met him about 2:30 p.m. at the agent's office. The appellee asked: "Was I bound?" The agent told him "yes, what happened?" The appellee told him that he was involved in an accident subsequent to their telephone conversation on Friday evening. The agent testified that the appellee-insured told him the accident happened at 8:45 p.m. It was later learned from a police report that the accident occurred at 8:05. The agent completed the application and took appellee's check with the understanding that the check wasn't any good until appellee put a check on another party in the bank the next day. Upon a telephone inquiry the next day, the bank advised the agent that appellee's check was not good. Appellee then brought the agent a third-party check which the agent never cashed because appellee's insurance was not desired.

The appellee testified that because of the illness of a friend in Texas, he and his family intended to make the 5-hour drive there on Friday night. At his wife's insistence that he secure insurance, he called appellant's agent "around 7:30 or a quarter until 8." According to appellee, appellant's agent seemed to recognize him and asked questions as to any previous accidents, his age,

"teenage drivers" and "whether my wife drove or not." Appellee answered all questions asked and also gave the names of lienholders on his cars since that information had to be on the policy. He also furnished his driver's license number. The agent declined appellee's offer to come by that night and complete the policy application and to make a down payment on the premium.

Appellee further testified that on the night of the accident he left his house at 5 or 10 minutes before 8 o'clock; that the accident occurred when he was forced from his lane of traffic and rear-ended another car which had stopped because of another accident; that the force of the impact threw him forward and against the steering wheel, bending it, and threw his son out of the front seat and underneath the dashboard; that he was much concerned about the condition of his wife and three children; that the state policeman made him get into the police car and sit there; that he was bleeding from the mouth, his lips were swollen and he was physically unable to use a telephone; that about 30 minutes after the accident he and his family rode about 6 blocks in the investigating officer's car from the scene of the accident to a filling station and later from that station to another one nearby to which appellee's car had been towed; there the officer released him about 9 p.m. and he and his family took a taxi to the hospital. The appellee testified that on the following Sunday afternoon he gave the agent a check for $100 in partial payment of the insurance premium with the explanation it would not be good the next day until the deposit of a third-party's check was made; and that his wife had $60 or $65 in cash but the agent preferred the check to the cash.

Appellee's wife estimated the phone call to appellant's agent was made between 6:30 and 7 and then changed the time to 7:30 after the court admonished appellee: "Don't shake your head, or instruct the witness what to say." The remainder of her testimony tended to corroborate the testimony of her husband.

A state policeman who observed the accident testi-

fied that he noted in his report that the accident occurred at 8:05 p.m.; that the closest telephone was off the interstate three and one-half blocks away; that as a result of the accident appellee was not very rational and that he had difficulty keeping him out of the traffic and had to place him in his car unit twice; that it took about 20 minutes or longer to investigate the two accidents; that he took appellee and his family to a filling station about 6 blocks from the scene and estimated that he arrived there about 8:30 p.m. and there he continued interviewing people involved in the accidents. He described appellee's condition: "He had blood about him in front, on the front of his shirt. He was very emotionally upset. He was—well, he would make statements about he caused all of it to happen and things like this and he was holding his head and just to be frank, I had a lot of trouble with the man." He further described appellee's behavior as being "very irrational." The officer's testimony was that he never observed the appellee using a telephone during the time he had him in his observation and custody which was from 8:05 p.m. until close to 9 p.m. when he released appellee and his family to go to the hospital.

The witness who owned the automobile which was struck by appellee testified that he observed appellee at the scene and later at the first filling station where the officer further questioned witnesses. This witness said that he did not see appellee use the telephone; that appellee acted as though "he was nuts" and was speaking incoherently; and that he had blood on his face.

The appellant further adduced evidence that in several instances appellee's insurance coverage was cancelled because of nonpayments resulting from disputes as to the amount of premium and scope of coverage; that he was charged about 10 times and convicted once for giving a check with insufficient funds. Appellee explained that these overdrafts were caused by a partner in the construction business withdrawing funds from the bank and that he, appellee, had "picked up" all the checks.

As we understand the record in this case, the only issue presented to the chancellor was whether the telephone call from the appellee to the appellant's agent, resulting in the binder for insurance, occurred before or after 8:05 p.m. The state policeman saw the accident and fixed the time at exactly 8:05. From that time until approximately 9 p.m. the appellee was in this officer's custody and observation (except possibly one to two minutes) and he never saw the appellee use a telephone. The officer corroborated appellee's testimony as to the extent of his injuries and his irrational condition. The chancellor found:

> "* * * When we accept the policeman's testimony, which was not disputed, we reach the inescapable conclusion that the phone call was made prior to 8 p.m. It is the Court's opinion that the evidence on this point preponderates in favor of defendant. Stated differently, plaintiff has failed to sustain its burden of proof that this was a post-accident insurance contract."

The court also found that the appellant had not established a fraudulent purpose in securing the insurance coverage.

On appeal a chancellor's decree will not be reversed where factual issues are in dispute unless the court's findings are against the preponderance of the evidence. *Scroggins* v. *Bowen*, 249 Ark. 1155, 464 S. W. 2d 79 (1971). When the evidence is conflicting or evenly poised or nearly so, the chancellor's judgment on the question of where the preponderance of the evidence lies is considered persuasive. In the case at bar, when we consider all the evidence and especially the investigating officer's testimony, as did the chancellor, we cannot say as a matter of law that his findings are against the preponderance of the evidence.

Affirmed.

Byrd, J., not participating.